The next case on the calendar is United States v. Churchill. May it please the Court, my name is David McColgan, I'm the attorney arguing on behalf of appellant Jeremy Churchill. The issue in this case is whether the Vermont State Police had reasonable suspicion to believe that my client, Jeremy Churchill, had burglarized a residence on Brazier Road in Vermont. Even in the absence of evidence placing him at or around the burglarized house at the time of the burglary. When Trooper Phelps was not far away from it and he was seen going towards it, the government argues that he was seen over a mile away. There is lack of evidence, there is lack of reasonable basis for thinking that the Jeremy that Earl Baum saw over a mile away was Jeremy Churchill. First of all, the dis- There was not a reasonable basis, Your Honor, because the description in that case was a vague description. It was a description of a gaunt white male, dark hair and shadowy face. Are the gaunt white males common in Vermont? Certainly, Your Honor. Some people could describe me as a gaunt white male, Your Honor. I know. Well, wasn't it also a gaunt white male named Jeremy driving a particular style pickup truck? With a woman in it and confirmed by the trooper seeing a truck with this Jeremy in it, also with a woman in it, all of which matched the same description. 18 miles away, Your Honor. Trooper Phelps didn't see Jeremy Churchill until 18 miles away. It's true that the individual described by Earl Baum did have the feeling he introduced himself by the name of Jeremy, but otherwise the description was vague. And even though the first name matches, the fact that Trooper Phelps thought of Jeremy Churchill, who lived 18 miles away, that is not reasonable suspicion, given the vagueness of the description. Again, gaunt white male, dark hair, shadowy face. The description of the truck itself was vague. It was a dark, described as a dark pickup truck, older. It's true he was seen driving a dark pickup truck, older model. But again, pickup trucks are common in Vermont. A dark model, older model is certainly not descriptive enough and certainly not specific enough to constitute reasonable suspicion. But even if we assume that there was reasonable suspicion that the Jeremy seen outside the Earl Baum residence was Jeremy Churchill, let's assume that for the moment. We still don't have geographic and temporal proximity to the burglary, because the burglary was a mile away, over a mile away at the Brazier residence. He was seen driving towards it. He was seen turning right in the direction. That's correct. He turned right instead of left. But again, he's seen turning right over a mile away. And somebody who was looking for fiddleheads could reasonably have wanted to look on a dirt road, which was to the right. That's the direction the dirt road continued, rather than to the left, which is where the paved road, the more main paved road of Town Hill Road was located. So there was nothing particularly suspicious about him turning right. And again, we have him turning right over a mile away. There are lots of further circumstances that you haven't mentioned that tend to support the reasonable suspicion. I mean, as to the fiddleheads, the person in the house had specifically told him if you're looking for fiddleheads, you go that way and turn right and you'll find fiddleheads there and he goes the other way. Secondly, he was acting suspicious in that he had knocked on the door but walking away as soon as he realized that somebody was home. That's a misreading of the record, Your Honor. The record contradicts that. What Phelps testified Earlbaum said was not that as soon as he opened the door, this individual started walking away. Instead, he testified that somebody knocked on the door. Earlbaum was upstairs. It took him a while to get downstairs. By the time he opened the door, the individual was already walking away. He turned and introduced himself and said, my name is Jeremy. I'm looking for some fiddleheads. So that the district court misread the record on that issue and said that, no, he turned as soon as somebody came to the door. That's contradicted by the record and that's clearly erroneous. Regarding the fact that he turned right instead of left, as directed by Earlbaum, that's not particularly suspicious. Anybody arriving there looking for fiddleheads. Scalia. It wouldn't be suspicious at all, except in the context that he says I'm looking for fiddleheads and the person says, you'll find fiddleheads down that way, and he leaves and goes the other way. Dreeben. But a person arriving at that location would have already passed by Town Hill Road and could have already seen that that's a main road, there's fields on either  That's the direction he came from. Well, that's true. But the more well-trafficked road at that point is Town Hill Road. Somebody turning onto or coming to Brazier Road at that point is more likely coming from the well-traveled road. And so somebody passing that way would have already seen that that's not a good spot for fiddleheads. I want to look further up the dirt road, which is Brazier Road, which has trees and streams on either side. That would seem like a more likely place to find the fiddleheads. So, again, the government tries Reasonable suspicion. We're not talking about proof beyond a reasonable doubt. Correct. Correct. I recognize that it's a fairly low standard, but we don't even meet that standard in this case. In advance of reasonable suspicion, there are alternate possibilities that may even be more likely than the reasonable suspicion. It's just a reasonable suspicion. I recognize. But in this case, we still don't have the geographic and temporal proximity. I see I have more time. In this case, Your Honor, if we compare this to cases that the government has cited as examples, we see that we don't, again, have the sort of geographic and temporal proximity that the Court looks for. For example, in the Compton case, which is the border checkpoint case that the government relies on fairly heavily. In that case, somebody was just coming over a hill near a border checkpoint. As soon as the border checkpoint came into sight, that person quickly turned off, veered off into the driveway of a vegetable stand. By the way, is your client a gaunt, white man? Yes, Your Honor. Thank you. Yes, Your Honor. That is correct. But, again, there's a lot of gaunt, white males, not only in Vermont, but elsewhere. Your argument is the patrol, the officer did not have enough to say, I know an individual named Jeremy that matches this description. The only way in your scheme that there would be reasonable suspicion is if he'd happen to see the Jeremy that he knew in the immediate vicinity of the burglary. If somebody did see him, where you have – I have a two-part argument, Your Honor. First, I don't think we have reasonable suspicion that the individual seen at the Earlbaum residence was Jeremy Churchill. But even if we assume that that individual was Jeremy Churchill, that's simply too far away from the Brasier residence to constitute reasonable suspicion. Two minutes away. You say it's a mile, but Brasier Road is, I gather, there's not much on it, and he's going in that direction, and he's two minutes' drive away. It's a mile away. He turns the truck in that direction. And as to Temporal, the thing is, you know, even if he had seen – even if he had been seen on the doorstep, we wouldn't know what time of day the burglary occurred. So it might have been that time. He was two minutes away by car from her house and driving in the direction of her house. That doesn't seem to me to be not matchable with reasonable suspicion. Well, Your Honor, again, I don't think that that – Together with everything else. Even together with the other evidence, Your Honor, I – particularly looking at the other cases where the government relies upon, the Court has looked for a closer link in terms of Temporal and geographic location. We had that, for example, in the Compton case. We had that in the Bailey case. The Bailey case, people who matched a general description were seen coming directly from the house that was suspected to have drugs in it. So we had a geographic connection. We simply don't have that here, Your Honor. I see my time is up. Thank you, Your Honor. Good morning. May it please the Court. My name is John Bosh. I represent the United States on this appeal. This Court should affirm Judge Crawford's decision. Based on the totality of the circumstances, there was reasonable suspicion for the Vermont State Trooper to investigate Jeremy Churchill's role in this burglary that happened on the same day. The reasonable suspicion was based on specific and articulable facts, including reliable and corroborated statements from civilian witnesses, as well as Churchill's suspicious conduct at the Earlbaum residence about a mile away from where the burglary took place. The faxes found by Judge Crawford included that the burglary took place while Nancy Brazier was at work. When she returned home around 4 p.m. that day, she found her house burglarized and her medicine cabinet ransacked. After that, the trooper went to Earlbaum's residence about a mile south on Brazier Road, talked to Earlbaum. Earlbaum told him, and this is found by Judge Crawford in his factual findings, that Earlbaum saw a man at his front door of his house who walked away as Mr. Earlbaum approached. Earlbaum also described the man as a white male, gaunt with dark hair and shadowy  And I will note for the Court. Ms. Sherry says the walking away part isn't reflected in the testimony, the underlying testimony, that the testimony is that Earlbaum took some time to get to the door, opened the door, and the man then turned around and introduced himself, Jeremy. So the, I don't think the testimony of the trooper supports that it took him some time to get down. What the trooper said during the suppression hearing was that he had been, he heard a knock on his door. He was upstairs in his residence working, heard a knock on the door, came downstairs to see a male on his porch walking back to the truck that was parked in his driveway. So I don't think it was clear error for Judge Crawford to find that Earlbaum saw a man at the front door of his house who walked away as Earlbaum approached. But the, I mean, one inference in that short period of time is that the person, the trooper didn't need to wait until the door was opened to know that there was somebody home because the person was coming downstairs. You make noise when you come downstairs. I don't know whether there was any window in the door that permitted seeing in that somebody was there. But the impression that the trooper got from the description of the owner of the house was that the person, on realizing that someone was home, was leaving rather than waiting to talk to the person. That's correct. That was the inference that the trooper drew. And I will note, as a matter of law, even if there wasn't innocent explanation for this conduct, even if the trooper or even if the man matching the description of Jeremy Churchill had truly been, thought nobody was home and was walking away, that innocent explanation can still factor into the reasonable suspicion analysis as it did here for the trooper. Another factor that wasn't mentioned in the argument of your adversary was the relevance of the ransacking of the medicine cabinet with respect to the state trooper's awareness that the Jeremy he knew was one who had drug addiction problems. That's correct in that it was another factor that was important to the trooper. The trooper had a long and direct history with this man, Jeremy Churchill. He knew that Mr. Churchill was a drug user. He knew that Mr. Churchill had been involved in property crimes. And just two months earlier, he had pulled Mr. Churchill over for speeding at the intersection of Brazier Road and Town Hill Road, practically right where the facts of this case derive from. I did want to touch briefly on the temporal and physical proximity arguments made by my adversary. It's not just the fact that a man matching Mr. Churchill's description was one mile from the scene of the burglary. It's that he disregarded Earl Baum's directions to the Fiddlehead Field and turned right out of the driveway in disregard of the directions and drove toward the scene of the burglary. So he's less than a mile away. And as far as temporal proximity, this entire case happens in the span of one day, from the burglary to the investigation and, finally, the trooper pulling over Mr. Churchill at 7 p.m. that evening. It is a little odd. I mean, Churchill lives 18 miles away. When you first hear that, I think to myself, my Lord, he thinks that this is a fellow because he's arrested him before he lives 18 miles away. But the thing that ties him to the area, you say, is that he'd seen him in the area previously and had actually arrested him for speeding not far from this location. So he knew that he had at least been here before. That's correct. He knew he had been there before. And I would submit that the relevant physical geographic proximity is not the 18 miles away where Mr. Churchill is ultimately encountered, but the fact that a man But Churchill lived a distance away from here, right? That's correct, yes. He lived in the town of Cabot, which was approximately 20 miles away or so. But the man matching Churchill's description, and I submit it is quite a good description. In fact, Judge Crawford described it as a surprisingly apt description. And the Court has it in the record at page 35. But that man, Jeremy Churchill, was a mile from less than a mile since he was driving in the direction of the burglar. And that's the relevant physical proximity question here, not where he's ultimately pulled over. Also, there's not just the resemblance of Churchill to the description the man gave, but there's also the correspondence of the description of the truck and the woman in the truck. And all those factors come into play. And we should be hesitant to engage in a divide-and-conquer analysis on this point, focusing too heavily on geographic or temporal proximity. It's certainly a totality-of-the-circumstances argument. And the truck is another factor. Earl Baum described it to the trooper as a late-model dark pickup truck. When the trooper pulled Churchill over later that evening, Churchill was driving a 2002 black Dodge pickup truck. And Earl Baum had also mentioned that there was a woman in the truck, and Churchill's girlfriend was present in the truck when he pulled her over later that evening. So looking at the totality of the circumstances here, there are all these factors that corroborate the witness statements. Churchill engaged in suspicious conduct, directly ignoring the directions to the Fiddlehead field. And for those reasons, unless the Court has any further questions, I will complete my argument there. Thank you. Sotomayor. Your Honor, first I'd like to address the impression of the trooper argument. There is no testimony by Trooper Feltz that it was his impression that Earl Baum was saying that he saw the person turning to leave as he came to the door. That was not his testimony. His testimony is at Joint Appendix, page 39, and to quote, it's that Paul indicated that earlier in the day he heard a knock on the door. He was upstairs in his residence working. Heard a knock on the door, came downstairs to see a man on the porch walking back to the truck that was parked in his driveway. That person introduced himself as Jeremy. So it was the Court's and the government's inference that this person was turning in response to hearing perhaps some footsteps or seeing somebody come down from upstairs. But that was not what the trooper said was his inference. So I think we have to be clear about what's in the record and what inference the Court and what inference the government is drawing. I don't think the Court's inference is supported by the record. Secondly, regarding the medicine cabinet issue that Your Honor raised, it's true that the medicine cabinet was ransacked. That is true in my experience in most burglaries, and the reason is not only because of this drug business, but because of the fact that the drug business is under    It's not true. Kennedy, you have said that 85 percent of all the burglaries that he investigated were drug related. Yes, Your Honor. That's correct. And he knew that, and he knew that Mr. Churchill had a drug issue and that indeed he had been involved in drug-related burglaries in the past. No. He did not say that. Okay. I apologize. Go ahead. But he did say he knew he had a drug habit. However, the drugs themselves are a valuable commodity that somebody would want to burglarize. They sell. There are a number of logical explanations, but the question is whether these add up in combination to a reasonable suspicion. Even in combination, this doesn't add anything, because it's a valuable commodity that even a non-addict would want to burglarize. Was it a reasonable suspicion that someone steals the drugs also that they might want to use them? You think they'd steal them just to sell them? They could steal them for either reason, Your Honor. Okay. Either to use them. Both are reasonable assumptions. Yes. Both are reasonable. Both are reasonable, but they don't suggest that a drug addict who lives 18 miles away and a month and a half was seen on old — on Town Hill Road is the person who committed this burglary. Thank you, Your Honor. Thank you both. We'll take the matter under advisement. Please return to your homes, gentlemen. Yes.